Filed 1/22/24  P. v. Daniel CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY JAKWON DANIEL,<br><br>    Defendant and Appellant. | F084961<br><br>(Super. Ct. No. BF184018A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Anthony Jakwon Daniel was convicted following a jury trial of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); second degree robbery (§ 212.5,

---

[1]    All further undesignated statutory references are to the Penal Code.

subd. (c); count 2); shooting at an occupied vehicle (§ 246; count 3); and assault with a semiautomatic firearm (§ 245, subd. (b); count 4). As to counts 1, 2, and 3, the jury found true that appellant personally discharged a firearm that proximately caused a death (§ 12022.53, subd. (d)), and, as to count 4, that appellant personally used a firearm (§ 12022.5). The jury also found true several aggravating circumstances as to each count: (1) the crime involved great violence (Cal. Rules of Court, rule 4.421(a)(1)[2]); (2) the victim was particularly vulnerable (rule 4.421(a)(3)); and (3) the crime involved planning and sophistication (rule 4.421(a)(8)).

Appellant was sentenced to an indeterminate prison term of 25 years to life plus 25 years to life for the firearm enhancement as to count 1; the upper term of five years plus 25 years to life as to count 2; the upper term of seven years plus 25 years to life for the firearm enhancement as to count 3; and the upper term of nine years plus 10 years for the firearm enhancement as to count 4. Punishment was stayed pursuant to section 654 as to counts 2 and 3, for a total prison term of 50 years to life plus 19 years.

On appeal, appellant, who was 19 years old at the time he committed the offenses, contends the court erred by excluding expert testimony on adolescent brain development. Appellant further contends his Sixth Amendment right to a jury trial was violated by the court's consideration of two aggravating circumstances not presented to nor found true by the jury—that he was on juvenile probation at the time of the offenses and that his performance on juvenile probation was unsatisfactory—in imposing the upper terms of imprisonment. Finally, appellant contends the sentencing minute order and abstract of judgment contain an error that conflicts with the oral pronouncement of judgment regarding the amount of the restitution fine imposed pursuant to section 1202.4.

We remand the matter for resentencing with directions to the trial court to only consider proper factors in deciding whether to impose the upper term of imprisonment in

---

[2] All further rule references are to the California Rules of Court.

2.

compliance with section 1170, subdivision (b). We decline to reduce appellant's restitution fine because the record indicates the minute order and abstract of judgment reflect the correct amount. In all other respects, the judgment is affirmed.

## FACTS

*Prosecution Case*

On the morning of December 31, 2020, Emmanuel Arechiga and his girlfriend, Alyssa Mazza, woke up, smoked some marijuana in Arechiga's car, and went to the bank to withdraw $500 from Arechiga's bank account. Arechiga had been planning to buy a gun, and that morning he told Mazza they were going to meet someone to buy the gun after withdrawing the money. Arechiga had received directions from someone via Snapchat as to where the transaction would take place.

When Arechiga and Mazza got near the area where they were supposed to meet the seller, someone standing in the street directed them to an alleyway. Mazza testified the person was white, skinny, had a buzzcut, and was wearing a mask. Further evidence presented at trial supported that this person was 17-year-old Vincent Hines. After Arechiga pulled into the alleyway, Hines stood next to the driver's side window, and he and Arechiga started arguing in a slightly aggressive manner, with Hines saying, "show me the money," and Arechiga saying, "show me the gun." As soon as Hines started talking, another person appeared to Hines' left towards the front of the vehicle, who, according to Mazza, was Black and a little taller than Hines, and was wearing a black hoodie and dark blue jeans. Further evidence presented at trial supported this person was appellant.

Mazza said both Hines and appellant were holding small silver guns. At one point, Hines demanded Arechiga's phone, wallet, and keys. Arechiga put his hands up and dropped everything, at which time the car jolted forward about five feet. When the car moved forward, Arechiga was shot through the back driver side window, and one of the perpetrators grabbed Arechiga's wallet off his lap. After Arechiga was shot, Mazza

3.

managed to navigate the car away from the scene and called 911. Mazza eventually parked at a nearby park. Arechiga died at the scene from the bullet wound.

At trial, Mazza testified she did not see who fired the shot. When the prosecutor asked Mazza if she remembered telling police that the shooter was the Black perpetrator, she responded, "Yes." When the prosecutor again asked her if she remembered at the time of trial who fired the shot, she replied, "Yes and no." She explained that she saw the Black perpetrator "turn as soon as the car had jolted, and I'm pretty sure I had seen him pull the trigger. But I'm not 100 percent sure exactly." After reviewing a transcript of her statement to police, she testified her memory was refreshed and that the "black male" was the shooter. The prosecution admitted Mazza's 911 call, where she identified the Black perpetrator as the shooter.

Police searched appellant's home and seized a phone and black sweatshirt from appellant's room, and a shotgun from the master bedroom.

Appellant was arrested and spoke to the police. He initially denied being involved with the shooting, but eventually explained he ran into Hines outside of his residence the morning of the shooting. Hines told appellant he was "tryin' to get some money early in the mornin' … and that he needed [appellant] like by him or whatever—make sure nothin' happened." Appellant told Hines he needed to first meet with his friend Levi Lopez, but while they were waiting, Arechiga and Mazza pulled up, and Hines "walked up to the Honda and like he just—he robbed, you—you know had the guy at gun point." Appellant said that after Hines robbed Arechiga, Hines "backed up a little bit, like, kind of a far distance and he pulled the trigger." Appellant was shocked. He did not know what to do, so he just ran. He told Hines to get away from his house, and then saw Lopez coming to his house.

When police asked appellant if he had a gun during the incident, he said he had a fake gun that he threw away in the dumpster behind his house. Appellant did not get any of the money Hines took. Appellant said he stole the shotgun found in his house from a

4.

homeless person though earlier in his interview appellant had stated he had never touched a gun.

Appellant was shown surveillance footage from the area near the scene and identified Hines as a subject with shorter hair wearing a light colored jacket and dark colored pants, another subject in black pants as Levi Lopez, and a subject wearing all black who was taller than the others, as himself.

Instagram records revealed that on the morning of December 31, 2020, prior to the shooting, Hines's account sent a message to appellant's account that said, "Mexican. Men you don't know" and "otw," which means "on the way." Appellant subsequently sent Hines a message that said, "where are you at" and made two short video calls to Hines. About 40 minutes after the shooting, Hines sent a message to appellant that read "run my money back or run me my fade, cuh." Appellant responded by saying, "cuh, don't talk to me … rn [right now]." Later appellant told Hines to "go somewhere." Hines responded by saying, "don't spend none of my money." A little over an hour after the shooting, appellant's phone showed three different searches for how to delete messages on Instagram.

In January 2021, in an Instagram message conversation between appellant's account and an account with the username 1uptop.Levi, 1uptop.Levi said, "the N word was hot. You killed him." In response, appellant said, "I overkilled his shii" and "he watched too." 1uptop.Levi said, "some Vinnie shii?" To which appellant responded, "cuh was sliding through the block and bounced out on me; so I offed his shii." He said, "I was like, what this N word creeping through my alley, cuh?"

The trial court took judicial notice of that fact that Hines had a pending juvenile petition in which he was also charged with the murder and robbery of Arechiga.

*Defense Case*

Appellant's mother testified that on the morning of the shooting, she was woken up by knocking on appellant's window. She got up and saw Hines and Lopez. Appellant

went outside, then back inside, then back outside. She later heard a "pop" and saw Hines and Lopez. She saw Hines give Lopez something that Lopez put into his satchel. She heard Hines say, "I almost domed that n[****]." She then saw appellant and told them she did not want anything to do with what was going on, and they left. She further testified appellant played a lot of video games, including Grand Theft Auto.

Hines's grandmother testified that she had seen a photograph of Hines standing next to a semiautomatic handgun on his bed.

Mitchell Eisen, Ph.D., testified that traumatic stress may overwhelm a person and affect their ability to pay attention to details of an event and remember them. The presence of a weapon may cause people to only focus on the weapon and may detract from their ability to adequately process and consolidate other details, and marijuana impairs a person's ability to encode and organize memories.

## DISCUSSION

**I.      Exclusion of Expert Testimony on Adolescent Brain Development**

*A.      Relevant Background*

The information alleged appellant committed felony murder under three theories: (1) he was the actual killer; (2) he aided and abetted the crime with intent to kill; and (3) he aided and abetted the crime as a major participant who acted with reckless indifference to human life.

The defense sought to introduce testimony from expert witness Dr. Elizabeth Cauffman "relevant to felony murder and specifically about youthful offenders (which [appellant] is), adolescent brain development and related topics as they pertain to reckless indifference to human life."

The People objected, contending whether appellant acted with "reckless indifference to human life" was a factual determination to be made solely by the jury. The People further contended "any generic testimony on the subject is irrelevant,

prejudicial, and likely to confuse the jury" and therefore should be excluded under Evidence Code section 352.

At the hearing, the prosecutor further argued the general idea that someone who is younger is less mature than someone who is older did not require expert testimony, and any more specific testimony that appellant could not have formed reckless intent because of adolescent brain development was infringing on the jury's role to decide that issue.

Defense counsel clarified that Dr. Cauffman would not purport to say what appellant's mental state was at the time of the crime but would talk about "the hallmark features of youth," from which the jury could consider in determining whether appellant acted with reckless indifference to human life. Defense counsel further explained he "would want to ask [Dr. Cauffman] generally is there a difference in maturity, appreciation of risk and consequence, a difference in, generally speaking, a process of decision making between, say, a late teen, a late teenager, and someone 10 or 20 years older." Defense counsel went on to say the jury may agree that was true, "[b]ut the question is why. And … the why has to do with brain development."

After hearing arguments from the parties, the trial court indicated its tentative was "maybe." The court indicated its intention was to have an Evidence Code section 402 hearing.

Later during trial, the court indicated that it looked into the issue and "was only able to find one published case" from New York, where the court "did not allow that type of testimony under the particular facts" of that case. The court further explained that it thought the type of testimony Dr. Cauffman was purported to give would be more appropriate at the sentencing stage. The court went on to say, "I know that [defense counsel] felt that that went directly to prove reckless indifference, but I'm not sure that the testimony at this particular point from the expert will aid the jury in deciding a verdict or reaching a verdict." The court excluded the testimony.

The court allowed defense counsel to make a final record of his position.  He explained that since the changes in the law on felony murder, where a prosecution or defense theory is that the defendant is an "aider and abetter nonshooter," the testimony of Dr. Cauffman was relevant on the elements of the substantive crimes charged.

The trial court admitted a PowerPoint presentation prepared by Dr. Cauffman as a court exhibit.

### B.    Analysis

Appellant contends the court erred by excluding Dr. Cauffman's testimony, and that the exclusion had the effect of violating his federal constitutional rights to a fair trial and to present a complete defense.  We need not address the merits of appellant's claims because the testimony's exclusion was clearly harmless under any standard.

The expert testimony was proffered as relevant to the jury's determination of whether appellant acted with reckless indifference to human life, which was only a factor relevant to the People's theory that appellant was guilty of felony murder as a nonshooter/major participant who acted with reckless indifference.  Because the jury found appellant guilty of the firearm enhancements, however, they clearly found appellant was the shooter, and thus the actual killer, meaning they did not need to make a determination as to whether he acted with reckless indifference to human life.  Given the jury's verdict, the exclusion of the expert testimony was clearly harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Appellant accepts the jury convicted him on the theory that he was the actual killer but says the error was not harmless nonetheless because the evidence could have given the jury reasonable doubt as to the identity of the killer.  We reject this contention.

Nothing in the offer of proof by defense counsel or Dr. Cauffman's Powerpoint presentation directly stated that a 17-year-old is more likely to be a shooter or engage in violent behavior than a 19-year-old.  The general focus of the proffered testimony appeared to be adolescent brain development and youths' failure to appreciate

8.

consequences of risky behavior generally. Much of the Powerpoint presentation suggests that general risk taking behavior peaks around the age of 19—appellant's age.[3] Appellant acknowledges this but focuses on one of the slides entitled "Adolescents and Young Adults Take More Risks in the Presence of Peers" that suggested adolescents around age 14 engaged in more risks in the presence of peers than youths around age 20. Appellant contends this would support an inference that Hines was more likely to shoot Arechiga than appellant because they were together at the time of the offense. It is not reasonable to conclude that this slide would have affected the jury's verdict given the posture of the present case.

While appellant's view of the record was that there was competing evidence about who the shooter was, the jury clearly found that, based on the state of the evidence, he was the shooter beyond a reasonable doubt. This means the jury likely found Mazza's testimony that appellant was the shooter credible and appellant's statement to police he was not the shooter not credible, and they likely did not accept defense counsel's suggestion that appellant's messages on Instagram about killing someone in an alley was about a video game. We are satisfied beyond a reasonable doubt that general testimony that adolescents are more likely to take risks in the presence of peers than youths would not place reasonable doubt in the mind of any of the jurors, in light of the entirety of Dr. Cauffman's presentation, as well as the credibility determinations, inferences, and findings they made based on the totality of the evidence presented at trial that led them to find that appellant was the shooter.

---

[3] One of the slides entitled "Adolescents Take More Risks" shows a chart depicting vehicle fatalities by age, with males ages 18 and 19 making up significantly more than drivers ages 16, 17, and over 19. The next slide, also entitled "Adolescents Take More Risks" shows that the age groups most likely to binge drink are ages 18-24 and 25-34, more than high school aged and other age groups. Another slide, entitled "Adolescents Take More Risks: Criminal Behavior Peaks During Late Adolescence" shows that the most arrests are among ages 18, 19, and 20, significantly more than age 17.

For the reasons we have stated, we find any error in excluding Dr. Cauffman's testimony was harmless beyond a reasonable doubt.

## II. Alleged Sixth Amendment Violation By Relying on Two Aggravating Factors Not Submitted to the Jury

### A. *Relevant Background*

Following the guilty verdict, the jury was asked to determine whether the following aggravating circumstances were present as to each count: (1) the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); (2) the victim was particularly vulnerable (rule 4.421(a)(3)); and (3) the manner in which the crime was carried out indicates planning, sophistication, or professionalism (rule 4.421(a)(8)). The jury found true each alleged aggravating circumstance.

The probation report listed two circumstances in mitigation—the defendant had a minimal record of criminal conduct and the defendant was under 26 years of age. As to aggravating circumstances, in addition to the three found true by the jury set forth above, it listed: "The defendant armed with or used a weapon at the time of the commission of the crime. (Pled and proven)";[4] and, most relevant here, "The defendant was on juvenile probation when the crime was committed"; and "The defendant's prior performance on juvenile probation was unsatisfactory in that he failed to comply with terms and/or re-offended."

At sentencing, the court made note of all mitigating and aggravating circumstances listed in the probation report. The court stated it would not be considering two of them: that the crime involved great violence and that the defendant was armed with or used a

---

[4]     The minute order reflecting the verdict indicates the jury's finding that appellant personally discharged a firearm under section 12022.53, subdivision (d) "encompasses California Rules of Court 4.421(A)(2) that defendant was armed with or used a weapon at the time of the crime." (Unnecessary capitalization omitted.)

weapon at the time of the commission of the crime because consideration of those factors would be inappropriate dual use given that appellant was convicted of murder and would be sentenced for the firearm enhancements.

The court concluded, "Based on the weight of the aggravating factors versus those in mitigation, the upper term and sentencing is justified as to the determina[te] counts and enhancements with their triad range of sentencing options." The court sentenced appellant as set forth above.

### B. Analysis

Appellant contends his Sixth Amendment right to a jury trial was violated by the court's consideration of the two aggravating factors not decided by the jury: that he was on juvenile probation when the crime was committed, and that his prior performance on juvenile probation was unsatisfactory. We agree the trial court erred by considering the two unproven aggravating circumstances and that, under the circumstances of this case, the error was not harmless. Accordingly, remand for resentencing is required.

#### 1. Legal Background

" 'The Sixth Amendment protects the right of a criminal defendant to a trial by jury, and under the Fourteenth Amendment, this protection applies to state criminal proceedings. (*Ramos v. Louisiana* (2020) 590 U.S. ___ [140 S.Ct. 1390, 1395-1397].) Among the specific protections included in the jury trial guarantee are the right to have every element of the crime found by a jury (*United States v. Gaudin* (1995) 515 U.S. 506, 511) and the right to have the jury make those findings beyond a reasonable doubt (*In re Winship* (1970) 397 U.S. 358, 364).' (*People v. Catarino* (2023) 14 Cal.5th 748, 754.)

"The United States Supreme Court explained in *Apprendi* [*v. New Jersey* (2000) 530 U.S. 466] the existence of these rights is not predicated on a distinction between elements of a crime and sentencing factors [citation], but on whether a required finding exposes the defendant to a greater punishment than that authorized by the jury's verdict [citation]." (*People v. Falcon* (2023) 92 Cal.App.5th 911, 928 (*Falcon*), review granted

11.

September 13, 2023, S281242.) "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey*, *supra*, 530 U.S. at p. 490.)

In *Cunningham v. California* (2007) 549 U.S. 270, the United States Supreme Court found California's pre-2007 determinate sentencing law (DSL) violated the Sixth Amendment because it allowed a sentencing judge to impose a term beyond the statutory maximum (deemed to be the middle term) based on facts not proven to a jury beyond a reasonable doubt or admitted by the defendant. (*Cunningham*, at p. 293.)

In response, the Legislature amended the DSL, doing away "with a presumptive middle term and le[aving] 'the choice of the appropriate term' to the 'sound discretion of the court.' " (*Falcon*, *supra*, 92 Cal.App.5th at p. 932.)

The Legislature once again amended the DSL, and "[a]s of January 1, 2022, under the changes effected by Senate Bill 567, a trial court imposing a sentence [could] no longer select any of the three terms that best serves the interests of justice, but must impose a sentence that does not exceed the middle term, except as provided in section 1170(b)(2)." (*Falcon*, *supra*, 92 Cal.App.5th at p. 932.) "[T]he middle term is once again the statutory maximum sentence for Sixth Amendment purposes." (*Id*. at p. 933.)

Section 1170, subdivision (b)(2) provides that "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." Section 1170, subdivision (b)(3) adds that "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."

### 2. The Court Erred by Considering Aggravating Circumstances the Underlying Facts of Which Were Not Found True by the Jury

As a threshold matter, respondent contends appellant has forfeited his claim by failing to raise it before the trial court, citing *People v. Scott* (1994) 9 Cal.4th 331, 356 and *People v. Flowers* (2022) 81 Cal.App.5th 680, 683–684. Appellant contends his claim has not been forfeited because he did not enter a waiver of his federal constitutional right to a jury trial. We decline to find forfeiture. Assuming respondent's argument is correct, we choose to exercise our discretion and address the merits of appellant's argument. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 520; *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1411.)

Here, the trial court relied on four aggravating circumstances to impose the upper term of imprisonment: two that were found true by a jury beyond a reasonable doubt, and two that were not. As to the two not found true by the jury, appellant did not stipulate to their truth, and, assuming juvenile adjudications fall within the prior conviction exception, which appellant contests, they were not proven by certified records, as the only indication they applied was in the probation report and a probation report is not a certified record. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 401 (*Dunn*), review granted October 12, 2022, S275655; § 1170, subd. (b)(2) & (b)(3).) Thus, the trial court's consideration of appellant's juvenile probation status and prior performance on juvenile probation was error under section 1170, as amended.

### 3. The Error Was Not Harmless

Appellant contends since the error here is a Sixth Amendment violation, we are required to find structural error, or, in the alternative, apply the *Chapman* harmless error standard. Appellant's contention is premised on his argument that he has a Sixth Amendment right to a jury trial as to each aggravating circumstance considered by the trial court. Respondent, on the other hand, contends that, as applied to the circumstances

13.

of this case, the Sixth Amendment only requires that one aggravating circumstance be proven beyond a reasonable doubt because only one aggravating circumstance is required to exceed the statutory maximum of the middle term citing, among other cases, *People v. Sandoval* (2007) 41 Cal.4th 825. We need not resolve this dispute. Assuming for the purpose of this analysis, appellant's Sixth Amendment right to a jury trial only attached to one aggravating circumstance, we conclude we still must remand for resentencing.

First, because the jury found at least one aggravating circumstance true beyond a reasonable doubt, there is no Sixth Amendment violation; that is because a sentencing court can impose a sentence higher than the statutory maximum based on one aggravating circumstance found true by the jury. (See *Dunn, supra*, 81 Cal.App.5th at p. 409 ["A fact that is *necessary* to impose a sentence above the statutory maximum must be proved to a jury beyond a reasonable doubt. However, as *Sandoval* has made clear, when multiple aggravating circumstances not proved to the jury are relied upon by a trial court in imposing the upper term, the reviewing court must only conclude beyond a reasonable doubt that *one* of those circumstances would have been found true by the jury beyond a reasonable doubt to avoid offending the Sixth Amendment"].)[5]

Thus, the error here is that the trial court relied on improper sentencing factors. Accordingly, we apply the state law harmless error standard set forth in *Watson*: "[T]he question posed is whether, in the absence of the improperly considered sentencing factor(s), there is a reasonable probability of a more favorable outcome for the appealing party—i.e., the imposition of a lesser sentence." (*Falcon, supra*, 92 Cal.App.5th at p. 941; see *People v. Avalos* (1984) 37 Cal.3d 216, 233; *People v. Price* (1991) 1 Cal.4th 324, 492.) We conclude that on the record of this case, there is a reasonable probability of a more favorable outcome for appellant.

---

[5] Appellant contends *Sandoval* was decided before the DSL was amended in 2022 and no longer applies. We decline to address appellant's contention because it would not have a bearing on the outcome of the present case.

Here, the court considered two mitigating circumstances, two proper aggravating circumstances, and two improper aggravating circumstances. The court's only reasoning for imposing the upper term was that it was "based on the weight" of the competing factors. Because the sentencing court did not suggest that it considered any of the aggravating circumstances more heavily than any other, it appears reasonably likely the improper aggravating circumstances influenced the court to impose the upper term. We note our decision is also impacted by the court's comments, which reflect a simple weighing of aggravating against mitigating circumstances that would have been proper under the former version of section 1170, but does not acknowledge that under the new DSL, "any weighing of aggravating circumstances must occur under the weight of the new rule favoring the middle term as the maximum sentence." (*Falcon*, *supra*, 92 Cal.App.5th at p. 948.) For these reasons, we conclude resentencing is required.

Respondent urges us to apply the harmless error analysis articulated by this court in *Dunn*, *supra*, 81 Cal.App.5th 394, a case which examined retroactive application of Senate Bill No. 567. Under the *Dunn* harmless standard: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step …, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent

15.

with section 1170, subdivision (b)." (*Dunn*, at pp. 409–410.)[6] Respondent urges us to make a finding under step (1)(b) in the present case—that the error was harmless because there is a reasonable probability the jury would have found the juvenile probation-related aggravating circumstances true beyond a reasonable doubt or that certified records would have proven them because the probation report is an official document that the defense would have objected to had it not been correct.

We decline to apply *Dunn* to the present case. Unlike *Dunn*, this case involves a direct application of section 1170. The Supreme Court, through *Avalos* and *Price*, has established how to determine harm in the situation presented here—where the court has considered improper sentencing factors—and we are required to follow *Avalos* and *Price*. In this situation, "[c]ourts do not first calculate the reasonable probabilities that what made the factor impermissible would not be cured under alternative circumstances, such as a more fully developed record or hypothetical evidence that might be presented to a jury." (*Falcon*, *supra*, 92 Cal.App.5th at p. 941.)[7] As we have explained, application of *Avalos* and *Price* shows the trial court's error was not harmless.

In sum, for the reasons set forth, we conclude the matter must be remanded for resentencing consistent with section 1170, subdivision (b).

---

[6]    The issue of what standard of assessing prejudice applies in the context of retroactive application of Senate Bill No. 567 in a case with an upper term sentence is pending before our Supreme Court in *People v. Lynch* (May 27, 2022, C094174) (nonpub. opn.) review granted August 10, 2022, S274942.

[7]    There is also a policy reason for not applying the (1)(b) step articulated in *Dunn* to cases of direct application of section 1170. Applying such a standard "support[s] speculation and broad assumptions about what extra-record evidence might show, [and] indicates the trial court's improper reliance solely on a probation report to determine prior convictions or related facts will always be harmless and nullifies the statutory requirements." (*Falcon*, *supra*, 92 Cal.App.5th at pp. 941–942.)

16.

## III. Restitution Fine

The reporter's transcript indicates the trial court stated, while pronouncing the judgment, that appellant was ordered to pay "a restitution fine in the amount of $30 [sic], pursuant to Penal Code Section 1202.4(b)" and "[t]here will be a restitution fine in the amount of $300, pursuant to Penal Code Section 1202.45. Payment of that fine is suspended subject to parole or Post Release Supervision revocation proceedings." The sentencing minute order and the abstract of judgment both reflect the imposition of $300 fines under both sections 1202.4, subdivision (b) and 1202.45.

Appellant contends the minute order and the abstract of judgment must be amended to reflect the oral pronouncement of judgment of a $30 restitution fine. He further contends the imposition of a $300 parole revocation fine is an "unauthorized sentence" and must be reduced to $30 to match the restitution fine. Respondent concedes on both points.

The parties are correct that as a *general* rule, "[w]hen there is a discrepancy between the minute order and the oral pronouncement of judgment, the oral pronouncement controls." (*People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073.) Because entering judgment in the minutes is a clerical function, a discrepancy between the judgment as orally pronounced by the court and as entered in the clerk's minutes is presumed to be the result of clerical error. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) *However*, the Supreme Court directs us to harmonize written and oral pronouncements if possible. (*People v. Smith* (1983) 33 Cal.3d 596, 599; see *People v. Cleveland* (2004) 32 Cal.4th 704, 768 [finding that an erroneous statement in the reporter's transcript purporting to impose a one-year sentence enhancement was "of no effect" because the minute order and abstract of judgment correctly omitted the enhancement].)

Here, we decline to accept respondent's concessions. It is patently clear from the record that the trial court misspoke when it imposed a $30 restitution fine and meant to impose a $300 restitution fine, and thus we can harmonize the erroneous oral

17.

pronouncement of judgment with the correct minute order and abstract of judgment. As both parties point out, the parole revocation fine must match the restitution fine, and the trial court imposed a $300 parole revocation fine.[8] (§ 1202.45.) In addition, $300 is the statutory minimum restitution fine under section 1202.4, subdivision (b)(1). These two facts together indicate to us the trial court intended to impose a $300 restitution fine and find no error with regard to the sentencing minute order or abstract of judgment.

As the matter is being remanded for resentencing, the trial court will be able to, and is encouraged to, make a record as to the error.

## DISPOSITION

The matter is remanded for resentencing with directions to comply with section 1170. In all other respects, the judgment is affirmed.


                                                            DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SMITH, J.

---

[8]    Interestingly, when imposing the parole revocation fine, the court referred to it as a "restitution fine," which further supports an inference the trial court simply misspoke when it ordered the $30 restitution fine.